# UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

PLANNED PARENTHOOD FEDERATION OF AMERICA, INC.; PLANNED
PARENTHOOD LEAGUE OF MASSACHUSETTS; PLANNED
PARENTHOOD ASSOCIATION OF UTAH,
*Plaintiffs-Appellees,*

v.

ROBERT F. KENNEDY, JR., in the official capacity as Secretary of the U.S.
Department of Health and Human Services; UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN SERVICES; MEHMET OZ, in the official capacity
as Administrator of the Centers for Medicare & Medicaid Services; CENTERS
FOR MEDICARE & MEDICAID SERVICES,
*Defendants-Appellants.*

On Appeal from the
United States District Court For The District Of Massachusetts
(No. 1:25-cv-11913)

## AMICUS BRIEF OF THE AMERICAN CENTER FOR LAW & JUSTICE IN SUPPORT OF DEFENDANTS-APPELLANTS

Jordan A. Sekulow
Olivia F. Summers
Nathan J. Moelker
AMERICAN CENTER FOR LAW &
 JUSTICE
201 Maryland Ave., NE
Washington, DC 20002
Phone: (202) 641-9163
Fax: (202) 546-9309
Email: nmoelker@aclj.org

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

The ACLJ is a non-profit legal corporation dedicated to the defense of constitutional liberties secured by law. The ACLJ has no parent corporation and issues no stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

INTEREST OF AMICUS ...........................................................................1

ARGUMENT .............................................................................................2

   I.   There is no constitutional right to subsidies for abortion providers................2

      A.  Supreme Court precedent has repeatedly emphasized that the government has no obligation to subsidize abortion providers. .................2

      B.  States have appropriate and necessary reasons for defunding Planned Parenthood....................................................................................8

   II.  Congress's decision not to subsidize a particular activity in no way meets the definition of a Bill of Attainder. ...........................................12

   III.  Compelling Congress to subsidize Planned Parenthood would violate the separation of powers. .....................................................................16

CONCLUSION .........................................................................................21

CERTIFICATE OF COMPLIANCE.......................................................22

CERTIFICATE OF SERVICE ................................................................23

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Buckley v. Valeo*, 424 U.S. 1 (1976) .........................................................................18

*California v. Azar*, 950 F.3d 1067 (9th Cir. 2020) ......................................................4

*Cincinnati Soap Co. v. United States*, 301 U.S. 308 (1937)....................................18

*Colorado Republican State Central Committee v. Anderson*,
  U.S. No. 23-696 (2023) ............................................................................................1

*Cummings v. Mo.*, 71 U.S. 277 (1867) .....................................................................14

*Dep't of Navy v. FLRA*, 665 F.3d 133 (D.C. Cir. 2012) ...........................................18

*Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022) ................................1

*Doe v. Gillespie*, 867 F.3d 1034 (8th Cir. 2017) .......................................................8

*Ex parte Garland*, 71 U.S. 333 (1867) .....................................................................14

*Fischer v. United States*, 144 S. Ct. 2176 (2024) .....................................................1

*Fletcher v. Peck*, 10 U.S. 87 (1810) ........................................................................12

*Harris v. McRae*, 448 U.S. 297 (1980)........................................................... 3, 5, 6

*Harris v. Olszewski*, 442 F.3d 456 (6th Cir. 2006)....................................................9

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) .......................................11

*INS v. Pangilinan*, 486 U.S. 875 (1988) ..................................................................19

*Maher v. Roe*, 432 U.S. 464 (1977) ............................................................... 3, 4, 5

*McDonnell v. United States*, 579 U.S. 550 (2016) ....................................................1

*Nixon v. Adm'r of General Servs.*, 433 U.S. 425 (1977) ............................ 12, 13, 14

*Office of Personnel Mgmt. v. Richmond,*
 496 U.S. 414 (1990) ............................................................ 18, 19, 20

*Planned Parenthood Ariz. Inc. v. Betlach*,
 727 F.3d 960 (9th Cir. 2013) ...............................................9

*Planned Parenthood of Greater Ohio v. Hodges*,
 917 F.3d 908 (6th Cir. 2019) ...............................................4

*Planned Parenthood of Greater Tex. Fam. Plan. & Preventative*
*Health Servs., Inc. v. Kauffman*, 981 F.3d 347 (5th Cir. 2020) ............8

*Planned Parenthood of Ind., Inc. v. Comm'r of Ind.*
 *State Dep't of Health*, 699 F.3d 962 (7th Cir. 2012) ...........................9

*Planned Parenthood of Kan. & Mid-Mo. v. Andersen*,
 882 F.3d 1205 (10th Cir. 2018) ...............................................9

*Regan v. Taxation With Representation of Wash.*,
 461 U.S. 540 (1983) ............................................................ 10, 11

*Roe v. Wade*, 410 U.S. 113 (1973) ...............................................4

*Rust v. Sullivan*, 500 U.S. 173 (1991) ................................ 3, 6, 7, 8, 12

*Selective Service System v. Minnesota Public Interest*
 *Research Group*, 468 U.S. 841 (1984) ...............................................14

*Trop v. Dulles*, 356 U.S. 86 (1958) ...............................................13

*Trump v. CASA, Inc.*, ___ U.S. ___ (2025) ...............................................19

*Trump v. United States*, 603 U.S. 593 (2024) ...............................................1

*Trump v. Vance*, 591 U.S. 786 (2020) ...............................................1

*United States v. Brown*, 381 U.S. 437 (1965) ...............................................15

*United States v. Lovett*, 328 U.S. 303 (1946) ...............................................15

*United States v. McIntosh*, 833 F.3d 1163 (9th Cir. 2016) ...................................... 18

**Constitutional Provisions**

U.S. Const. art. I, § 9, cl. 3 ................................................................... 12

U.S. Const. art. I, § 9, cl. 7 ................................................................... 17

**Other Authorities**

The Federalist No. 47 (James Madison) ................................................. 16

The Federalist No. 51 (James Madison) ................................................. 17

The Federalist No. 58 (James Madison) ................................................. 17

Thomas M. Cooley, *Treatise on Constitutional Limitations* 316 (5th ed. 1883) .... 13

# INTEREST OF AMICUS[1]

This case involves an assault on the separation of powers and Congress's authority to choose not to fund abortion or abortion providers. The American Center for Law & Justice ("ACLJ") is an organization dedicated to the defense of constitutional liberties and principles secured by law, including separation of powers, and the sanctity of life. ACLJ attorneys argued numerous cases before the Supreme Court of the United States, *e.g.*, *Colorado Republican State Central Committee v. Anderson*, U.S. No. 23-696 (2023); *Trump v. Vance*, 591 U.S. 786 (2020); or as amici, *e.g.*, *Trump v. United States*, 603 U.S. 593 (2024); *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022); *Fischer v. United States*, 603 U.S. 480 (2024); and *McDonnell v. United States*, 579 U.S. 550 (2016). The ACLJ has dedicated time and effort to defending and protecting Americans' constitutionally protected freedoms and has a fundamental interest in maintaining the integrity of the founders' constitutional design. This includes supporting the separation of powers and the ability of the Congress to choose not to appropriate funds in support of abortion or abortion providers.

---

[1] No party's counsel in this case authored this brief in whole or in part. No party or party's counsel contributed any money intended to fund preparing or submitting this brief. No person, other than amicus, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief. All parties have consented to the filing of this amicus brief.

# ARGUMENT

## I. There is no constitutional right to subsidies for abortion providers.

There is one core problem at the heart of Planned Parenthood's case. Planned Parenthood seeks to claim a constitutional right to be subsidized by the taxpayer. There is no such right. On the contrary, there is a fundamental distinction between governmental interference with conduct and governmental decisions about what activities merit public funding. Congress has ample authority to choose not to subsidize activities like abortion and to promote life instead. This lawsuit against Congress's appropriations decisions should fail for this fundamental reason.

### A. Supreme Court precedent has repeatedly emphasized that the government has no obligation to subsidize abortion providers.

The Supreme Court has long recognized a basic truth: the government need not subsidize an action just because it is lawful. This principle has led the Supreme Court to consistently hold that while the Constitution may prevent the government from placing obstacles in the path of protected conduct, it does not require the government to fund activities that run counter to its policy judgments. Even while *Roe* had created a so-called "right" to abortion, from *Maher v. Roe* through *Harris v. McRae* to *Rust v. Sullivan*, the Supreme Court consistently held that the government may constitutionally make policy and value judgments in allocating public funds under government programs and is not required to subsidize abortion by including coverage for abortion in public-benefits programs. *Maher v. Roe*, 432

U.S. 464, 470-71, 474 (1977) (rejecting challenge to Connecticut Welfare Department regulation limiting state Medicaid benefits for first-trimester abortions to those that are medically necessary); *Harris v. McRae*, 448 U.S. 297, 322-23 (1980) (rejecting challenge to Medicaid Act's Hyde Amendment's limitation of funding to those abortions necessary to save life of mother, while permitting funding of costs associated with childbirth); *Rust v. Sullivan*, 500 U.S. 173, 192-94 (1991) (rejecting challenge to regulations providing funding for family-planning services but prohibiting funds for abortion counseling and referral).

The doctrine is as simple as it is settled: when Congress appropriates public funds to establish a program, it is entitled to define that program's limits. That includes the Medicaid funding Planned Parenthood seeks to claim for itself. A refusal to fund an activity, without more, cannot be equated with the imposition of a penalty on that activity. To hold otherwise would be to conflate the government's role as sovereign with its role as patron, effectively conscripting taxpayers to subsidize activities their representatives have determined warrant no public support. Planned Parenthood fundamentally misunderstands constitutional principles, attempting to twist the Constitution's guarantee of negative liberty into a supposed right to taxpayer-funded support—a distortion the Supreme Court consistently and rightly rejected. Plaintiffs completely ignore the federal government's legitimate

interest in favoring childbirth through the allocation of (or refusal to allocate) taxpayer dollars.

Even under the *Roe* regime, the Supreme Court has consistently recognized the interest of the government in preventing federal money from being used for abortion. *See Rust*, 500 U.S. at 200-01 (upholding 1988 federal regulations prohibiting the use of Title X money to perform, promote, refer for, or support abortion as a method of family planning). *Roe* itself acknowledged the government's "interest in the potentiality of human life." *Roe v. Wade*, 410 U.S. 113, 164 (1973). Circuit courts have likewise acknowledged the state's fundamental interests in valuing and promoting childbirth over abortion. *See, e.g., California v. Azar*, 950 F.3d 1067 (9th Cir. 2020) (en banc) (upholding 2018 federal regulations prohibiting the use of Title X money to perform, promote, refer for, or support abortion as a method of family planning); *Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908 (6th Cir. 2019) (en banc) (upholding Ohio law that prohibited abortion organizations from participating in six state health education programs).

*Rust, Maher,* and *McRae* are dispositive. *Maher*, 432 U.S. 464, upheld a state welfare regulation under which Medicaid recipients received payments for services related to childbirth, but not for nontherapeutic abortions. The Supreme Court, only a few years after *Roe*, rejected the claim that this unequal subsidization was a violation of the Constitution. *Id.* The Court held that the government may "make a

value judgment favoring childbirth over abortion, and . . . implement that judgment by the allocation of public funds." *Id.* at 474. *Maher* anchors this case. The Supreme Court's holding that states need not subsidize abortions through Medicaid holds even more firmly when applied to the federal government. "There is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy." *Id.* at 475.

"A refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity." *McRae*, 448 U.S. 297, 317 n. 19. In *McRae*, the Supreme Court upheld the Hyde Amendment in the face of legal challenges like the present case, holding that the Hyde Amendment's restrictions on federal Medicaid funding for abortions did not violate the Constitution. There, the Court rejected Plaintiffs' Due Process Clause challenge, ruling that the government has no constitutional obligation to subsidize the exercise of even fundamental rights—of which abortion is not—and that the Hyde Amendment posed no governmental barrier to a woman seeking an abortion. Rather, it encouraged childbirth (in which the state has a legitimate interest) over abortion through the allocation of public funds. *Id.* at 317-18. The Court again distinguished funding restrictions from direct governmental interference, emphasizing that the government need not remove obstacles like indigency. *Id.* at 316. In *McRae* the government's refusal to subsidize "medically necessary" abortions despite its decision to subsidize

other medically necessary health procedures did "not impinge on the due process liberty [to terminate a pregnancy] recognized in [*Roe v.*] *Wade.*" *Id.* at 318. The refusal to provide such funding left the appellees "with at least the same range of choice in deciding whether to obtain a medically necessary abortion as [they] would have had if Congress had chosen to subsidize no health care costs at all." *Id.* at 317. The Court indicated that the government may sponsor health care programs for pregnant women without sponsoring abortion, because "it simply does not follow that a woman's freedom of choice carries with it a constitutional entitlement to the financial resources to avail herself of the full range of protected choices." *Id.* at 316.

In *Rust*'s challenge to health department regulations limiting the ability of Title X fund recipients to engage in abortion-related activities, the Supreme Court rejected First Amendment and Fifth Amendment arguments similar to the ones Planned Parenthood advances here, such as claims of viewpoint discrimination. *Rust*, 500 U.S. at 192-93 (sustaining a prohibition on abortion-related advice by recipients of federal funds designated for family-planning counseling). "A refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity. There is a basic difference between direct state interference with a protected activity and state encouragement of alternative activity consonant with legislative policy." *Id.* at 193 (internal quotations omitted). The Supreme Court held that the "mere decision to exclude abortion-related services from a federally

funded *preconceptional* family planning program" could not "impermissibly burden" a woman's right to obtain an abortion. *Id.* at 201-02. As it explained, "[t]he Government has no constitutional duty to subsidize an activity merely because the activity is constitutionally protected," and instead "may validly choose to fund childbirth over abortion." *Id.* at 201. Although "[i]t would undoubtedly be easier for a woman seeking an abortion if she could receive" abortion information "from a Title X project," there is no constitutional requirement that "the Government distort the scope of its mandated program" to provide it. *Id.* at 203. "The difficulty that a woman encounters when a Title X project does not provide abortion counseling or referral," for instance, "leaves her in no different position than she would have been if the Government had not enacted Title X." *Id.* at 202.

The *Rust* Court established that the government may constitutionally engage in selective funding to encourage activities it deems in the public interest without simultaneously funding alternative approaches to the same problem, and that such selective funding does not constitute viewpoint discrimination or unequal treatment. *Id.* at 193. This was true even when abortion was incorrectly considered by the Supreme Court to be a "constitutional right." The bottom line is clear: "when the Government appropriates public funds to establish a program it is entitled to define the limits of that program." *Id.* at 194. Rather than denying organizations the right to engage in abortion-related activities, Congress simply declined to subsidize such

activities with public funds: "Congress has merely refused to fund such activities out of the public fisc . . . ." *Id.* at 198.

Planned Parenthood refuses to acknowledge that the Defund Provision has any legitimate goal. But the Supreme Court has made clear that the government can choose not to fund abortion providers or procedures. Congress did not ban abortion-related activities; it just decided not to pay for them—a choice it has every right to make.

### B. States have appropriate and necessary reasons for defunding Planned Parenthood.

When it defunded Planned Parenthood, Congress did not act in a vacuum. Congress's decision reflects a broader policy judgment shared by governments at multiple levels. Many states have reached similar conclusions about funding abortion providers, based on their own assessments of the competing priorities in healthcare spending of preserving and promoting life. *Planned Parenthood of Greater Tex. Fam. Plan. & Preventative Health Servs., Inc. v. Kauffman*, 981 F.3d 347, 351 (5th Cir. 2020) (en banc) (Texas disqualified Planned Parenthood as a Medicaid provider because of substantial evidence that Planned Parenthood engaged in unethical conduct involving the sale of fetal tissue.); *Doe v. Gillespie*, 867 F.3d 1034, 1038 (8th Cir. 2017) (Arkansas Governor announced that because Planned Parenthood "does not represent the values of the people of our state and Arkansas is better served by terminating any and all existing contracts with them."); *Planned*

*Parenthood of Kan. & Mid-Mo. v. Andersen*, 882 F.3d 1205, 1213-14 (10th Cir. 2018) (Medicaid contracts with Planned Parenthood terminated for several reasons, including "unethical or unprofessional conduct."); *Planned Parenthood Ariz. Inc. v. Betlach*, 727 F.3d 960, 963 (9th Cir. 2013) (Arizona law prohibiting state contracts of any kind with abortion providers); *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 967 (7th Cir. 2012) (Indiana law prohibiting state agencies from providing state or federal funds to abortion clinics served the state's interest in "eliminat[ing] the indirect subsidization of abortion."); *Harris v. Olszewski*, 442 F.3d 456 (6th Cir. 2006). These decisions—whether made by state legislatures, governors, or federal representatives—involve the same fundamental question: how to allocate limited public resources among competing healthcare needs. The Constitution does not require any level of government to privilege one healthcare provider over others, particularly when that provider's activities conflict with the funding authority's policy goals in promoting and preserving life. The state can appropriately choose not to subsidize abortions or abortion providers.

Just a few months ago, the Supreme Court upheld South Carolina's decision not to provide Medicaid to Planned Parenthood, concluding that the relevant statute did not create a right to sue. *Medina v. Planned Parenthood S. Atl.*, No. 23-1275, 2025 U.S. LEXIS 2492, at *2 (June 26, 2025) ("Citing state law prohibiting public

funds for abortion, South Carolina in July 2018 determined that Planned Parenthood could no longer participate in the State's Medicaid program."). The Supreme Court affirmed South Carolina's right to exclude abortion providers from its Medicaid program and held, overruling much of the precedent Planned Parenthood relies upon in its complaint, that Planned Parenthood lacked an enforceable right to sue South Carolina to stay on the state Medicaid program. *Id.* at *35.

While a case that does not directly concern abortion, *Regan v. Taxation With Representation* of *Washington* is illustrative. In that case, the Supreme Court upheld a requirement that nonprofit organizations seeking tax-exempt status under 26 U.S.C. §501(c)(3) not engage in substantial efforts to influence legislation. *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 546 (1983) (dismissing "the notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State" (internal quotation marks omitted)). The tax-exempt status, the Supreme Court explained, "ha[d] much the same effect as a cash grant to the organization." *Id.* at 544. A corporation challenged the statute arguing, among other things, that "Congress' decision not to subsidize its lobbying violate[d] the First Amendment [because] the prohibition against substantial lobbying by § 501(c)(3) organizations impose[d] an 'unconstitutional condition' on the receipt of tax-deductible contributions." *Id.* at 545 (citation omitted) (bracketed alterations supplied). The Court discussed the nature of tax exemptions and tax deductions and

concluded that tax exemptions are a form of subsidy. By limiting that benefit, §
501(c)(3) status, to organizations that did not attempt to influence legislation,
Congress had merely "chose[n] not to subsidize lobbying." *Id.* at 544. Congress did
not limit the organization's ability to lobby the government in any way. *See id.* at
545. Instead, Congress merely "chose not to subsidize lobbying" by limiting the
availability of Section 501(c)(3) tax-exempt status. *Id.* at 544.

It is true that federal Medicaid does not, itself, cover abortions, thanks to the
Hyde Amendment upheld in *McRae*. But Planned Parenthood ignores a critical
reality: "[m]oney is fungible." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 31
(2010). Money Planned Parenthood receives from Medicaid to subsidize one service
is money that it can then utilize to perform another action, namely, abortion. When
the government provides funding to an organization for permitted activities, those
funds free up other resources that can be redirected toward activities the government
prefers not to support. Congress has consistently sought to ensure that federal dollars
do not indirectly subsidize abortions, even when not directly funding them. The
constitutional question is not whether this indirect effect exists, but whether
Congress may reasonably act to prevent it. Decades of precedent, from *Maher*
through *Rust*, confirm that it may. To ignore this reality would be to permit
constitutional end-runs around legitimate policy choices made by the people's
elected representatives.

The Constitution does not require that the government fund all family-planning activities equally. Congress is not taking action regarding Planned Parenthood's speech or its views. *Rust*, 500 U.S. at 193 ("There is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy."). Instead, Congress, as precedent clearly allows, chose to prevent federal funds from being used for abortion in any manner, direct or indirect.

## II. Congress's decision not to subsidize a particular activity in no way meets the definition of a Bill of Attainder.

The Bill of Attainder Clause, U.S. Const. art. I, § 9, cl. 3, has a very specific and defined meaning; it provides a protection for punishment on a person without a trial. *Fletcher v. Peck*, 10 U.S. 87, 138 (1810) ("A bill of attainder may affect the life of an individual, or may confiscate his property, or may do both."). But an individual is not "attained whenever he or it is compelled to bear burdens which the individual or group dislikes." *Nixon v. Adm'r of General Servs.*, 433 U.S. 425, 470 (1977). Such broad conceptions "removes the anchor that ties the bill of attainder guarantee to realistic conceptions of classification and punishment." *Id.*

A bill of attainder requires a punishment, and ordinarily a criminal punishment. The constitutional text thus prohibits not every legislative burden, but only those that constitute "punishment" in the historical sense. Here, Congress has done nothing more than decline to subsidize abortion providers—a decision that falls

comfortably within legislative prerogative, not constitutional prohibition. Treating every funding decision as a potential bill of attainder would strip the clause of its distinct historical purpose. As the nineteenth century constitutional scholar Thomas Cooley explained, "[a] bill of attainder was a legislative conviction for alleged crime, with judgment of death." Thomas M. Cooley, *Treatise on Constitutional Limitations* 316 (5th ed. 1883). Historically, "[a]ttainder, in a strict sense, means an extinction of civil and political rights and capacities[.]" *Id.* The Supreme Court has consistently required that there be an actual punishment implemented before the Bill of Attainder Clause is triggered. *Trop v. Dulles*, 356 U.S. 86, 95–96 (1958) ("Each time a statute has been challenged as being in conflict with the constitutional prohibitions against bills of attainder and *ex post facto* laws, it has been necessary to determine whether a penal law was involved, because these provisions apply only to statutes imposing penalties.").

As all the cases that Planned Parenthood may cite likewise make clear, an inescapable requirement for the Bill of Attainder Clause to apply is, in fact, a punishment. Specificity alone does not do the trick. For example, *Nixon v. Adm'r of General Servs.*, 433 U.S. at 470, held that a statute that specified President Nixon by name regarding the disposal of his papers was not a Bill of Attainder, due to a lack of punishment. Any alleged adverse effect by the government's use of his papers was not a punishment within the Constitutional meaning. The key inquiry is

"whether the challenged statute falls within the historical meaning of legislative punishment." *Selective Serv. Sys. v. Minnesota Pub. Int. Rsch. Grp.*, 468 U.S. 841, 852 (1984). That historical background is the foundation; "[t]he infamous history of bills of attainder is a useful starting point in the inquiry whether the Act fairly can be characterized as a form of punishment leveled against appellant." *Nixon*, 433 U.S. at 473. The Court emphasized that "the substantial experience of both England and the United States with such abuses of parliamentary and legislative power offers a ready checklist of deprivations and disabilities so disproportionately severe and so inappropriate to nonpunitive ends that they unquestionably have been held to fall within the proscription . . . ." *Id.*

To try and meet this high standard, Planned Parenthood has cited to "legislative bars to participation by individuals or groups in specific employments or professions." *Selective Serv. Sys.*, 468 U.S. at 852. Planned Parenthood relies explicitly on cases like *Cummings v. Mo.*, 71 U.S. 277 (1867), where the Supreme Court struck down a provision of the Missouri post-Civil War Reconstruction Constitution that barred persons from various professions unless they stated under oath that they had not given aid or comfort to persons engaged in armed hostility to the United States and had never "been a member of, or connected with, any order, society, or organization, inimical to the government of the United States." *Id.* at 279. *Ex parte Garland*, 71 U.S. 333, 374 (1867) struck down a similar law in federal

courts. The irony of relying on a case about civil rights for ex-confederates aside, the Supreme Court in these cases struck down laws that banned individuals categorically from categories of employment. *See also United States v. Brown*, 381 U.S. 437 (1965), in which Communist Party members were barred from offices in labor unions. The Supreme Court has held, in other words, that banning individuals from employment or a whole area of employment can constitute a punishment under the Bill of Attainder Clause.

Planned Parenthood and its employees are not banned from working in any capacity. The federal government neither regulates the medical profession nor dictates whether Planned Parenthood can or cannot operate in any state. The medical regulations governing Planned Parenthood's operations are questions of state law. Instead, the federal government simply chose not to fund a particular entity, following its significant policy interest in preventing federal funds from supporting abortion. This case differs sharply from *United States v. Lovett*, 328 U.S. 303 (1946), where Congress cut off pay for three named government employees still performing their duties, effectively "sentence[ing] them to perpetual exclusion from any government employment." *Id.* at 316. No comparable punishment exists here; Planned Parenthood remains fully free to operate and employ its staff as it chooses. Congress has simply decided not to subsidize abortions or fund organizations primarily engaged in performing them. Otherwise, every time Congress declines to

fund an activity, it could face a bill of attainder challenge, transforming every appropriations decision into potential litigation—a result the Constitution does not contemplate or intend.

In short, the bill of attainder argument should be rejected because Planned Parenthood has not been punished. It has merely been denied the subsidy it seeks. Congress's choice not to fund certain conduct is not a bill of attainder, but an exercise of its legitimate legislative authority.

## III. Compelling Congress to subsidize Planned Parenthood would violate the separation of powers.

"No political truth is certainly of greater intrinsic value, or is stamped with the authority of more enlightened patrons of liberty, than" the Constitution's separation of powers. The Federalist No. 47 (James Madison). Planned Parenthood seeks the extraordinary relief of compelling Congress to spend funds for its benefit. Plaintiffs seek an "injunction" that would force the federal government to disburse money Congress has not appropriated—indeed, funds that Congress expressly declined to appropriate.

Congress enacts appropriations and the President, as the chief of the executive branch, is given the authority and responsibility to administer public funds, to oversee their disbursement, and to ensure that funds are distributed in accordance with law. The power over the purse is one of the most important authorities allocated to Congress in the Constitution's "necessary partition of power among the several

departments." The Federalist No. 51 (James Madison); *see also* The Federalist No. 58 (James Madison) ("This power over the purse may, in fact, be regarded as the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people, for obtaining a redress of every grievance, and for carrying into effect every just and salutary measure.").

Plaintiffs demand the extraordinary remedy of forcing Congress to spend taxpayer dollars to subsidize Planned Parenthood. This lawsuit presents an extreme attempt to usurp Congress's constitutional authority to control the power of the purse. The injunctive relief sought by Plaintiffs, if granted, would directly violate Article I of the Constitution. The Constitution's text could hardly be clearer: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. These words establish a straightforward rule—Congress, and Congress alone, controls federal spending. The Framers placed this power in the legislative branch for good reason: those closest to the people should determine how the people's money is spent.

What Plaintiffs seek here—a judicial command forcing Congress to appropriate funds it has declined to appropriate—would invert this constitutional design. Courts cannot compel Congress to spend money any more than Congress can compel courts to decide cases. The Appropriations Clause's words convey a "straightforward and explicit command": no money "can be paid out of the Treasury

unless it has been appropriated by an act of Congress." *Off. of Pers. Mgmt. v. Richmond,* 496 U.S. 414, 424 (1990) (*quoting Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)) (internal quotation marks omitted); *See Dep't of Navy v. FLRA*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (Kavanaugh, J.) (describing Congress's "exclusive power over the federal purse").

Congress and only Congress has authority to expend public funds. "The Clause has a 'fundamental and comprehensive purpose . . . to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents.'" *United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016) (quoting *Richmond*, 496 U.S. at 427-28). It "protects Congress's exclusive power over the federal purse," and "prevents Executive Branch officers from even inadvertently obligating the Government to pay money without statutory authority." *FLRA*, 665 F.3d at 1346-47 (internal quotation marks and citations omitted).

"The principle of separation of powers was not simply an abstract generalization in the minds of the Framers: it was woven into the document that they drafted in Philadelphia in the summer of 1787." *Buckley v. Valeo*, 424 U.S. 1, 124 (1976). The Appropriations Clause's "straightforward and explicit command" ensures Congress's exclusive power over the federal purse. *Richmond*, 496 U.S. at 424. Critically, "[a]ny exercise of a power granted by the Constitution to one of the

other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *Id.* at 425.

The Supreme Court has recently warned against the dangers of an "imperial Judiciary." *Trump v. CASA, Inc.*, No. 23-1275, 2025 U.S. LEXIS 2492, at *2 (June 26, 2025). Those dangers are illustrated by the relief the Plaintiffs request. Ordering Congress to appropriate money that it has not so appropriated is inconsistent with the separation of powers and the explicit command of the Constitution. Neither the executive nor the judiciary has authority to appropriate unauthorized funds. Similarly, ordering the executive branch to draw moneys from the Treasury, in defiance of an explicit Congressional decision not to appropriate them, is inconsistent with the separation of powers. In particular, the Supreme Court has made it undeniable that equitable relief "cannot grant respondent a money remedy that Congress has not authorized." *Richmond*, 496 U.S. at 426; *See INS v. Pangilinan*, 486 U.S. 875, 883 (1988) ("Courts of equity can no more disregard statutory and constitutional requirements than can courts of law."). Equitable relief can no more mandate an unauthorized expenditure then can the actions of the Executive.

The relief Plaintiffs seek here—an injunction compelling Congress to fund their operations—represents precisely the sort of judicial overreach the Framers designed our Constitution to prevent. The Appropriations Clause's "straightforward

and explicit command" that no money shall be drawn from the Treasury without congressional appropriation stands as an insurmountable barrier to Plaintiffs' unprecedented request. *Richmond*, 496 U.S. at 424. To grant the relief sought would not merely exceed judicial authority—it would invert the constitutional order, transforming courts from interpreters of law into super-legislators empowered to direct the expenditure of public funds according to their own policy preferences rather than those of the people's elected representatives. The Constitution's text, structure, and history all point to the same conclusion: Congress alone holds the power of the purse, and no court may compel it to open that purse against its will.

Consider what Plaintiffs are really asking this Court to do. They want a federal judge to order Congress to spend money that Congress has specifically voted not to spend. This request misconceives the judicial role in our constitutional system. Courts interpret laws and ensure they comply with constitutional requirements—but they do not write appropriations bills or second-guess legislative priorities. If courts could force Congress to fund organizations dissatisfied with its spending decisions, every budgetary choice would risk becoming a constitutional issue. The Constitution of the United States, however, assigns spending authority to the branch most accountable to the people whose money is at stake.

## CONCLUSION

For the foregoing reasons, Amicus Curiae American Center for Law and Justice respectfully asks this Court to vacate the District Court's Preliminary Injunction.

Respectfully Submitted,

/s/ Nathan J. Moelker
Nathan J. Moelker
Jordan A. Sekulow
Olivia F. Summers
AMERICAN CENTER FOR LAW &
 JUSTICE
201 Maryland Ave., NE
Washington, DC 20002
Phone: (202) 641-9163
Fax: (202) 546-9309
Email: nmoelker@aclj.org

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

### with type volume limit, typeface Requirements and type-style requirements

This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(b) because it contains 4,770 words, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft word for office 365 in 14-point Times New Roman font.

Date: <u>October 3, 2025</u>                        /s/ Nathan J. Moelker
                                                                Nathan J. Moelker
                                                                *Counsel for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 3, 2025, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system, which will send notification of that filing to all counsel of record in this litigation.

/s/ Nathan J. Moelker
Nathan J. Moelker
*Counsel for Amicus Curiae*